UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GARY P. MCGUIRE,

    Plaintiff,

vs.                                            Case No. 8:15-cv-2670-T-27AAS

ADEX CORPORATION a/k/a
ADEX TELECOM, INC.

    Defendant.
_____/

## ORDER

**BEFORE THE COURT** are Adex Corporation's Motion for Summary Judgment (Dkt. 40), Gary McGuire's Motion for Summary Judgment (Dkt. 41), and responses (Dkts. 51, 52).[1]

### I. Undisputed Material Facts

Plaintiff and a partner formed Defendant Adex Corporation, a telecommunications staffing business, in 1993. (Dkt. 42 ¶¶ 1, 2). Plaintiff served as its president. (*Id.* ¶ 3). Nineteen years later, InterCloud Systems Inc. ("Intercloud") purchased Defendant through an Equity Purchase Agreement on September 17, 2012.[2] (Dkt. 40-1). In conjunction with the Equity Purchase Agreement, the parties executed an Employment Agreement, naming Plaintiff the President and Chief Operating Officer of Defendant. (Dkt. 46-10).

One month later, on October 17, 2012, Plaintiff and Mark Munro, Intercloud's Chief

---

[1] This single count breach of contract action was removed from Hillsborough County Circuit Court on the basis of diversity jurisdiction. (Dkt. 1). Defendant is a New York corporation with its principal place of business in Alpharetta, Georgia, Plaintiff is domiciled in Florida, and the amount in controversy exceeds $75,000. (*Id.*).

[2] Intercloud was formerly known as Genesis Group Holdings, Inc. (Dkt. 46 at 56:15-17).

1

Executive Officer, exchanged emails discussing Plaintiff assuming responsibility for Intercloud's professional services division. (Dkt. 42-2). The effect of the email exchange is disputed, but the content is not, as will be discussed. In early 2014, Intercloud began restructuring Defendant. (Dkt. 46 at 100:6-2; Dkt. 46-22). Plaintiff objected, claiming interference with his management of Defendant. (Dkt. 42 ¶¶ 8-9).

On July 21, 2014, Defendant terminated Plaintiff, effective on is anniversary date, September 30, 2014. In November 2014, Plaintiff demanded compensation for breach of his Employment Agreement, specifically for failing to pay a termination payment as defined in Section 7(b), interfering with his function as COO, failing to increase his base salary, failing to provide a stock grant, and failing to pay his life insurance premiums. (Dkt. 42 ¶ 14). This lawsuit for breach of contract followed.

## II. Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine disputes of material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party fails to demonstrate the absence of a genuine dispute, the

motion should be denied. *Kernel Records*, 694 F.3d at 1300 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606-08 (11th Cir. 1991)). On the other hand, "[i]f no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." *See Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015)(quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994)). And, "[w]here 'parties file[ ] cross-motions for summary judgment [,] . . . each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 648 n.12 (2d Cir. 2016) (alterations in internal quotation in original) (quoting *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

## III. Discussion

Contract interpretation is ordinarily a matter of state law. *In re Chira*, 567 F.3d 1307, 1311 (11th Cir. 2009). The Employment Agreement included a choice of law provision specifying that Florida law governs its interpretation. *See Russo v. Fifth Third Bank*, 634 F. App'x 774, 776 (11th Cir. 2015).

Under Florida law, the elements of a breach of contract action are a valid contract, a material breach, and damages. *Sulkin v. All Florida Pain Mgmt., Inc.*, 932 So. 2d 485, 486 (Fla. 4th DCA 2006). The dispute between the parties focuses on whether (1) Plaintiff is due a "termination payment" as defined in Section 7(b) of the Employment Agreement, (2) the October 17, 2012 email exchange between Plaintiff and Munro modified the Employment Agreement, (3) Defendant materially breached the Employment Agreement by failing to pay life insurance premiums, failing to issue stock options, and interfering with Plaintiff's management of the company, and (4) Plaintiff

3

suffered damages.

## A. Termination Payment

The first dispute between the parties is whether Defendant breached the Employment Agreement by failing to pay Plaintiff a termination payment under Section 7(b) after his employment was terminated, effective September 30, 2014.

Plaintiff's employment began on September 30, 2012 for an initial term of one year, and that it was to continue on an annual basis thereafter, unless terminated. (Dkts. 40-1, 42-1). His employment continued for an additional year, beginning September 30, 2013. On July 21, 2014, Defendant terminated his employment by letter captioned: "Re: Non-Renewal of Employment Agreement" effective on his anniversary date, September 30, 2014. (Dkt. 42-4).

The Employment Agreement provides in pertinent part:

> 2. Effective Date: Term of Employment: This Agreement shall commence and be effective for all purposes as of the date hereof, and shall remain in effect until the end of the Earn Out Period (as defined in the Equity Purchase Agreement) (the "Initial Term"). The period during which Employee is employed by Employer pursuant to this Agreement is called the "Term of Employment". **The Agreement shall continue on a year-to-year basis thereafter unless either party terminates the Agreement by at least thirty (30) days prior written notice prior to the expiration of the Initial Term or any subsequent anniversary thereof. The Agreement may also be terminated during the Term of Employment in accordance with paragraph 7 below.**
>
> . . .
>
> 7. Termination of Agreement.
>
> (a) Employer agrees not to terminate this Agreement except for "just cause" and agrees to give Employee written notice of its belief that acts or events constituting "just cause" exist. . . .
>
> (b) Employer retains the right to discharge Employee for any reason not specified above. Employer agrees, however, that if it discharges Employee for any reason other than "just cause" . . . Employee will be entitled to a full compensation, including participation in all benefit programs . . . for one (1) year. . . . All

4

compensation received by Employee pursuant to this Subsection (b) is collectively referred herein as the "Termination Payment."

(Dkt. 42-1).

In clear, unambiguous language, the Employment Agreement provides that Plaintiff's employment could be terminated under Section 2 on his anniversary date, with 30 days advance notice, or during the annual term, with or without just cause, under Section 7. (Dkt. 42-1). And Section 2 provides that "[t]he Agreement may *also* be terminated during the Term of Employment in accordance with paragraph 7 below." (emphasis added). This language evidences an intent to provide alternative means of termination, one without a termination payment (Section 2), and the other with a termination payment, if termination was without just cause (Section 7).

Construing these provisions together, and giving reasonable meaning to the entire agreement, Defendant was contractually authorized to terminate Plaintiff's employment effective on his anniversary date with thirty days prior notice pursuant to Section 2, or terminate his employment effective at any other time pursuant to Section 7.[3] *See Publix Super Markets, Inc. v. Wilder Corp. of Delaware*, 876 So. 2d 652, 654 (Fla. 2d DCA 2004).

In accordance with Section 2, Defendant, after providing thirty days notice, terminated the agreement effective on Plaintiff's anniversary date, September 30. (Dkt. 42-4). Section 7(b) was therefore not implicated. Accordingly, since the termination was not effective during the term of Plaintiff's employment, whether he was terminated for just cause or not is immaterial. Plaintiff was therefore not entitled to a termination payment under Section 7(b). As to this dispute, Defendant's motion is due to be granted, and Plaintiff's motion is due to be denied.

---

[3] The parties use terms such as non-renewal and terminate to reference the conclusion of Plaintiff's employment. The distinction is immaterial, since Plaintiff's employment was ultimately terminated. Further, Plaintiff conflates the meaning of Section 7 by relying on the extrinsic evidence of Donald Sprague's termination payment. Even if Sprague's termination payment was considered, his termination payment was not paid in conjunction with his employment agreement, but was separately negotiated as part of a separate employment contract. (Dkts. 40-8, 40-9).

5

### B. October 17, 2012 Email Exchange

Plaintiff contends that his Employment Agreement was modified by his email exchange with Intercloud's CEO, Mark Munro. (Dkt. 41 at 6). Defendant counters that the email exchange did not constitute a modification of the Employment Agreement in accordance with its terms.

The Employment Agreement provides that "[t]his Agreement may be amended only by a *written instrument duly executed by or on behalf of the parties hereto.*" (Dkt. 42-1 ¶ 9(b))(emphasis added). When contracting parties agree on a method for modifying their agreement, "it is not the province of a court to second guess the wisdom of their bargain, or to relieve either party from the burden of that bargain by rewriting the document." *Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc.*, 145 So. 3d 989, 993 (Fla. 4th DCA 2014). The contract is enforced as written. *Id.* To amend the Employment Agreement, therefore, the parties agreed to utilize a written instrument duly executed.

Defendant contends that the exchange of emails, although in writing, are not duly executed. Florida law provides, however, that electronic signatures "may be used to sign a writing and shall have the same force and effect as a written signature." Fla. Stat. § 668.004. And, "[e]lectronic signatures means any letters, characters, or symbols, manifested by electronic or similar means, executed or adopted by a party with an intent to authenticate a writing. A writing is electronically signed if an electronic signature is logically associated with such writing." Fla. Stat. § 668.003.

Under Florida law, therefore, the emails collectively constituted a written instrument duly executed by Plaintiff and Munro, since their names are typed in the email exchange, logically associated with the email exchange.[4] *See* Fla. Stat. §§ 668.003- .004; *See Hermosilla v. Coca-Cola*

---

[4] If Defendant is contending that Munro could not sign on behalf of Defendant, that assertion is unsupported. Munro is the CEO of Intercloud. Intercloud purchased Defendant through an Equity Purchase Agreement. (Dkt. 40-1). Defendant, therefore, is a wholly owned subsidiary of Intercloud. (Dkt. 46 at 56:11-17). And, the evidence supports that

6

*Co.*, 446 F. App'x 201, 203 (11th Cir. 2011) (*per curiam*) (finding complete contracts from multiple emails). Notwithstanding, amending the Employment Agreement required more than a writing and signatures. Defendant's argument that the email exchange was nothing more than "a proposal based on future contingencies"(Dkt. 52 at 12) and "was executory in nature and contingent on Plaintiff assuming further responsibilities that were never fulfilled" (Dkt. 40 at 20), is not without merit.

"Modifications of contracts must be supported by new consideration as well as the consent of both parties." *Newkirk Constr. Corp. v. Gulf Cty.*, 366 So. 2d 813, 815 (Fla. 1st DCA 1979); *Wilson v. Odom*, 215 So. 2d 37, 39 (Fla. 1st DCA 1968) (same) (citing *Murphy v. Royal American Industries, Inc.*, 188 So.2d 884 (Fla. 4th DCA 1966); *United Contractors, Inc. v. United Construction Corp.*, 187 So.2d 695 (Fla. 2d DCA 1966)).

As is the case here, with a bilateral contract, "'the promise of one is the consideration for the promise of the other[,]'" but"'[i]f for any reason the promise of one party is not binding upon him, it is not a sufficient consideration for the promise of the other and the contract is void for want of consideration.'" *Wright & Seaton, Inc. v. Prescott*, 420 So. 2d 623, 625 (Fla. 4th DCA 1982) (quoting *Meurer Steel Barrel Co. v. Martin*, 1 F.2d 687, 688 (3d Cir. 1924)). And underlying the principle of contract modification, "'[w]here essential terms of an agreement remain open, and subject to future negotiation, there can be no enforceable contract.'" *Bankers Trust Co. v. Basciano*, 960 So. 2d 773, 777 (Fla. 5th DCA 2007) (quoting *Dows v. Nike, Inc.*, 846 So.2d 595, 602 (Fla. 4th DCA 2003)).

The relevant provisions of the October 17, 2012 email exchange demonstrate that the terms of the proposal remained open. Munro proposed putting Plaintiff "in charge" of the professional

---

Intercloud, as the parent corporation, could amend an agreement between Plaintiff and Defendant. (Dkt. 48 at 80:4-6; Dkt. 42-4).

7

services division (Dkt. 42-2), but stated that "he would like to be sure [Plaintiff] [was] up for this role." He thought Plaintiff was, **"but need[ed] to be sure."** (*Id.*) (emphasis added). Munro wrote: "I will bring your salary up to $300K **but ask that you wait till we close the S-1**. We will also develop a solid comp plan for you so you have solid cash and stock upside." (*Id.*) (emphasis added). Significantly, he concluded with: "OK this is quite a bit. **Let me know if you want to meet again soon to discuss and iron out details.**" (*Id.*) (emphasis added). And Plaintiff responded: "I'm in. Thanks for your confidence. **Discuss details as we go.**" (*Id.*) (emphasis added). Munro responded: "Great. I think we can make some good things happen." (*Id.*).

The email exchange did not create an enforceable amendment to the Employment Agreement. Material terms were left open for discussion, and Munro expressly included several contingencies before the proposal could be consummated, including waiting until the S-1 was closed, wanting to discuss details such as Plaintiff's compensation plan, and closing with "let me know if you want to meet again soon to discuss and iron out details." Accordingly, Defendant was not contractually bound to place Plaintiff in charge of the professional services division, and could not have breached a non-existent contractual amendment. *See Wright & Seaton, Inc.*, 420 So. 2d at 625; *Bankers Trust Co.*, 960 So. 2d at 777. On this issue, Plaintiff's motion is due to be denied and Defendant's motion is due to be granted.

### C. Life Insurance Premiums, Stock Options, and Company Management

The parties disagree on whether Defendant materially breached the Employment Agreement by failing to pay life insurance premiums, failing to issue stock options, and interfering with Plaintiff's management of the company. Under Florida law, "[t]o constitute a vital or material breach, a party's nonperformance must 'go to the essence of the contract.'" *MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 849 (11th Cir. 2013), certified question answered, 143 So. 3d 881

8

(Fla. 2014) (quoting *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So.2d 853, 857 (Fla. 4th DCA 1972). "[I]t must be the type of breach that would discharge the injured party from further contractual duty on his part." *Beefy Trail, Inc.*, 267 So. 2d at 857.

**1. Life Insurance Premiums**

In Section 4 (h) of the Employment Agreement, Defendant agreed to "provide and pay the premiums for Employee term life insurance in the benefit amount of $2,000,000 during the Employment Term." And life insurance was a part of Plaintiff's compensation package.(Dkt. 42-1). Yet, it is undisputed that Defendant did not make the life insurance payment for the annual term beginning September 30, 2014.[5] (Dkt. 40 at 23; Dkt. 52 at 9). It follows that as to this claimed breach, Plaintiff's motion is due to be granted and Defendant's motion is due to be denied. That is not to say, however, that Plaintiff individually suffered damages. Ruling is therefore deferred on damages.

It is likewise undisputed that Adex Medical Staffing made the 2013 and 2014 premium payments, with Plaintiff's approval. (Dkt. 45 at 73:11-24). While Defendant contends that Plaintiff failed to seek reimbursement for the premiums, its contention relates to Plaintiff's claim for damages and Defendant's affirmative defense that Plaintiff caused his own damages, not whether it failed to perform its obligation under the Employment Agreement.[6] Accordingly, because Defendant failed to pay the premiums for Plaintiff's life insurance for the 2013 term, that was a material breach of the Employment Agreement. *See Benemerito & Flores, M.D.'s, P.A. v. Roche*, 751 So. 2d 91, 93 (Fla.

---

[5] Because the Employment Agreement was terminated in accordance with Section 2, Plaintiff is not entitled to benefits for the 2014-2015 term.

[6] And, Plaintiff avers that failing to submit the invoices for his life insurance payment to Defendant was inadvertent, that he suffered a loss for the payment of the premiums through the third party company, and when he realized the third party company had paid the premiums, he made a demand on Defendant to make the payments. (Dkt. 42 ¶ 27).

9

4th DCA 1999) (if the employer wrongfully refuses to pay the employee compensation, the employee is relieved of any further contractual obligations).

**2. Stock Options**

Section 4(g) of the Employment Agreement provides that "[t]he Employer shall cause the Company to grant Employee stock options pursuant to an incentive stock option plan with the parent company intends to adopt before the end of 2012." (Dkt. 42-1).

On December 17, 2012, Intercloud filed an information statement pursuant to Section 14 (c) of the Securities Exchange Act of 1934. (Dkt. 46-26). Included as Exhibit A to the statement is a 2012 Performance Incentive Plan ("the Plan"). (*Id.* at 28). The purpose of the Plan was to "provid[e] an additional means through the grant of awards to attract, motivate, retain and reward selected employees and other eligible persons." (*Id.* at 28 ¶ 1). Eligible persons under the Plan include officers of Intercloud's subsidiaries, including Plaintiff. (*Id.* at 28 ¶ 2; Dkt. 46 at 135:4-7). And stock options were part of the available awards. (Dkt. 46-26 at 33 ¶ 5.1.1). An incentive stock option, therefore, was adopted by Intercloud, the parent company, before the end of 2012.

It is undisputed that stock options were not issued to Plaintiff. Defendant provides various reasons for why stock options were not issued, including the testimony of Intercloud's corporate representative, Lawrence Sands, that stock options were not granted Plaintiff due to his performance. (Dkt. 52 at 12) (citing Dkt. 46 at 135:8-12, 135:18-136:4). However, Sands, when asked "why was [Plaintiff] not ever granted stock options under the 2012 performance incentive plan," testified: "**It would be just guessing, but I believe that the board of directors probably didn't think that his performance was worthy of a grant.**"[7] (Dkt. 46 at 134:9-13) (emphasis added).

Moreover, Defendant's Chief Accounting Officer, Daniel Sullivan, avers that stock options

---

[7] It is not apparent who was designated to issue awards pursuant to the Plan. (Dkt. 46-26 at 28 ¶ 3.1).

10

could not have been issued until after the S-1 was completed on October 31, 2013, and after Plaintiff's "Earnout Payment" pursuant to the Equity Purchase Agreement was finalized in January 2014. (Dkt. 40-4). Plaintiff's contention that Defendant breached Section 4(g) is therefore undermined by the limited time frame stock options could have been issued, according to Sullivan. And whether, as Sands testified, Plaintiff did not qualify for stock options due to his performance is undermined by his contradictory testimony that he was "just guessing" about what the board thought.

This testimony raises a material factual dispute as to whether stock options could have been granted between January 2014 and September 30, 2014, and whether Plaintiff was entitled to them. This dispute cannot be resolved on summary judgment. Accordingly, the parties' motions as to this issue are due to be denied.

### 3. Management of Company

Plaintiff contends that Defendant interfered with his ability to manage by making changes to the company, including having Plaintiff report to Intercloud COO Roger Ponder, rather than the Board of Directors, having employees report to an Intercloud employee, Scott Davis, rather than Plaintiff, and imposing hiring and traveling policies.

Some of those changes are disputed.[8] Plaintiff testified that some of Defendant's employees were directed to report to Davis in early 2014 (Dkt. 45 at 54:5-56:23), and this "gutted [his] responsibility at the company." (Dkt. 42 ¶ 8). Yet, Munro testified that employees did not report to Davis until after Plaintiff was terminated (Dkt. 48 at 12:5-7). Plaintiff testified that he reported to Ponder (Dkt. 45 at 32:4-8), but Ponder testified that Plaintiff never reported to him (Dkt. 47 at 33:16-

---

[8] Regarding hiring policies, Defendant does not dispute that a hiring freeze was imposed. (Dkt. 51 at 11).

18).[9]

Plaintiff also contends that these changes were not effectuated by Defendant's Board of Directors. Section 1(a) of the Employment Agreement provides that Plaintiff "shall have full authority and responsibility to undertake and carry out the functions and activities of such positions in all respects, subject only to the directions of, and policies established and communicated to [him] from time to time by Board of Directors of Employer which are consistent with this Agreement." (Dkt. 42-1).

Plaintiff testified that he had no knowledge of a Board of Directors, and never saw or met with any directors, naming some individuals who he believed were on the board.[10] (Dkt. 45 at 49:1-24; 62:25-63:5). The implication is that the changes Plaintiff complains about were made at the direction of Intercloud executives, rather than Defendant's Board of Directors. (*See e.g.* Dkt. 48 at 53:11-14) (Intercloud's president was authorized to implement policies for its subsidiaries).

In sum, whether Defendant interfered with Plaintiff's management by effectuating changes without the direction of the Board of Directors cannot be resolved on summary judgment, as there are disputed issues of material fact. Accordingly, the parties' motions on this issue will be denied.

### C. Damages

Because there are disputed issues of material fact regarding the claimed breaches that cannot be reconciled at summary judgment, ruling is deferred on the amount of any damages.

## IV. Affirmative Defenses

Plaintiff moves for summary judgment on all ten of Defendant's affirmative defenses: (1)

---

[9] Notwithstanding, Plaintiff testified that reporting to Ponder did not effect his ability to continue Defendant's operations. (Dkt. 45 at 32:9-11).

[10] But, it is not clear if the board members he named were Adex board members or Intercloud board members. (Dkt. 45 at 32:4-11).

failure to state a claim, (2) failure to mitigate damages, (3) set-off, (4) laches, (5) waiver and equitable estoppel, (6) damages were caused by Plaintiff, (7) damages were caused by third parties, (8) statute of frauds, (9) Plaintiff's claim is barred based on the express terms of the Employment Agreement, and (10) Plaintiff's claim is barred because the Employment Agreement was not modified.

Partial summary judgment may be granted on affirmative defenses. *Int'l Ship Repair & Marine Servs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 944 F. Supp. 886, 891 (M.D. Fla. 1996). Plaintiff has the burden of showing that Defendant cannot maintain these defenses by a preponderance of the evidence. *See Eli Research, LLC v. Must Have Info Inc.*, No. 2:13-CV-695-FTM-38CM, 2015 WL 5934632, at *2 (M.D. Fla. Oct. 6, 2015).

### A. First and Third Defenses: Failure to State a Claim and Set-Off

Defendant withdraws its first and third affirmative defenses regarding failure to state a claim and setoff. (Dkt. 52 at 14 n. 12). Accordingly, summary judgment will be denied as moot on the first and third affirmative defenses.

### B. Second, Sixth, and Seventh Defenses: Failure to Mitigate Damages, Damages Caused by Plaintiff, and Damages Caused by Third Parties

Defendant's second, sixth, and seventh affirmative defenses relate to damages. Because ruling is deferred on damages, Plaintiff's motion for summary judgment will be denied as to Defendant's second, sixth, and seventh affirmative defenses.

### C. Fourth Defense: Laches

As its fourth affirmative defense, Defendant asserts that Plaintiff's claim is barred by laches. "Laches is based upon an unreasonable delay, in asserting a known right which causes undue prejudice to the party against whom the claim is asserted." *Brumby v. Brumby*, 647 So. 2d 330, 331

13

(Fla. 4th DCA 1994), cause dismissed, 651 So. 2d 1192 (Fla. 1995) (citations omitted).

Plaintiff testified that he complained to Munro about the changes which interfered with his ability to manage the company at the end of April 2014. (Dkt. 45 at 55:20-56:11). And less than two months after his employment was terminated, Plaintiff made a demand through counsel regarding other alleged breaches of the Employment Agreement. (Dkt. 42-5). Based on these undisputed facts, Plaintiff has shown by a preponderance of the evidence that there were no unreasonable delays in asserting his rights under the Employment Agreement. Accordingly, summary judgment is due to be granted on Defendant's fourth affirmative defense.

### D. Fifth Defense: Waiver and Equitable Estoppel

As its fifth affirmative defense, Defendant asserts that Plaintiff's claim is barred by waiver and equitable estoppel. Plaintiff contends that there is no evidence to support Defendant's fifth defense. Defendant counters that Plaintiff "has waived and is estopped from seeking damages." (Dkt. 52 at 15). It appears, therefore, that Defendant's fifth affirmative defenses relates to damages. Summary judgment is therefore due to be denied on Defendant's fifth affirmative defense.

### E. Eight and Tenth Defenses: Statute of Frauds and Plaintiff's claim is barred because the Employment Agreement was not modified

As its eight and tenth affirmative defenses, Defendant asserts that Plaintiff's claim regarding overseeing the professional services division is barred by the statute of frauds, and the Employment Agreement was never modified. These defenses are subsumed within the finding that the Employment Agreement was not modified. Accordingly, summary judgment as to Defendant's eight and tenth affirmative defenses is due to be denied as moot.

### F. Ninth Defense: Plaintiff's claim is barred based on the express terms of the Employment Agreement

As its ninth affirmative defense, Defendant asserts that Plaintiff's claim is barred because he

seeks relief inconsistent with the express terms of the Employment Agreement. As Plaintiff correctly argues, this defense is a denial of the elements of his claim, rather than an affirmative defense. (Dkt. 41 at 22). *See Home Design Servs., Inc. v. Stewart*, No. 3:09CV140-MCR MD, 2011 WL 796741, at *5 (N.D. Fla. Feb. 28, 2011) (affirmative defenses admit the allegations of the complaint). And, to the extent this affirmative defense is based on Plaintiff's claim for a termination payment, it is subsumed within the finding that he is not entitled to a termination payment. Summary judgment is therefore due to be granted on this defense.

**V. Conclusion**

Based on the forgoing, Adex Corporation's Motion for Summary Judgment (Dkt. 40) is **GRANTED in part**, and **DENIED in part**, and Plaintiff's Motion for Summary Judgment (Dkt. 41) is **GRANTED in part**, and **DENIED in part**.

**DONE AND ORDERED** this 19th day of April, 2017.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record

15